**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:

OLD CONCRETE CO., INC. f/k/a
TITAN CONCRETE, INC.

               Debtor.
-----------------------------------------------------------------x

Chapter 7

Case No. 23-35835 (KYP)

**MEMORANDUM DECISION ENFORCING THIS COURT'S SALE ORDER**
**AGAINST POINT H. REALTY CORP. AND SCHEDULING A FURTHER**
**HEARING ON CIVIL CONTEMPT SANCTIONS**

**APPEARANCES:**

MCGRAIL & BENSINGER LLP
*Attorneys for 101 Hudson NY LLC*
888-C 8th Avenue #107
New York, NY 10019
By:    David McGrail, Esq.
        Sophia Herbst, Esq.
        Veronique Urban, Esq.
            Of Counsel

PENACHIO MALARA, LLP
*Attorneys for Point H Realty Corp.*
245 Main Street, Suite 450
White Plains, NY 10601
By:    Anne Penachio, Esq.
           Of Counsel

**HONORABLE KYU YOUNG PAEK**
**UNITED STATES BANKRUPTCY JUDGE**

## **INTRODUCTION**

In November 2024, 101 Hudson NY LLC ("Purchaser") purchased the assets of Titan Concrete, Inc. ("Debtor") that the Debtor used for operating a concrete batch plant business and manufacturing and selling ready-mix concrete ("Business") for a purchase price of $1,360,000.  The Court approved the sale of the Debtor's Business assets by entry of the *Order Approving the Sale of Certain of the Debtor's Personal Property Wherever Located Free and Clear of Liens, Claims and Encumbrances and Granting Related Relief*, dated October 23, 2024 ("Sale Order") (ECF Doc. # 394).[1]  The Debtor operated its Business out of three concrete plants located in Carmel, NY ("Carmel Plant"), Stamford, CT ("Stamford Plant"), and the Bronx, NY ("Bronx Plant").  Point H. Realty Corp. ("Point H") is the owner of the premises where the Bronx Plant is located and was the Debtor's landlord.  Despite the sale closing having occurred, a portion of the assets that were sold to the Purchaser remain in the Bronx Plant ("Bronx Purchased Assets"), and the Purchaser has now moved to enforce the Sale Order, alleging that Point H has interfered with the Purchaser's ability to take possession of the Bronx Purchased Assets ("Motion").[2]  The Purchaser also seeks award of reasonable attorneys' fees and expenses for prosecuting the Motion and enforcing the Sale Order.  Point H opposes the Motion.[3]  As set forth herein, the Court FINDS that Point H has obstructed

---

[1]     "ECF Doc. # _" refers to documents filed on the electronic docket of this case.  "ECF p. _" refers to the page number imprinted across the top of the page by the Court's electronic filing system.

[2]     *See Motion of 101 Hudson NY LLC to Enforce Sale Order Against Point H. Realty Corp.*, dated Feb. 7, 2025 ("Purchaser Brief") (ECF Doc. # 448).

[3]     *See Objection of Point H. Realty Corp. to the Motion of 101 Hudson NY LLC to Enforce Sale Order*, dated Feb. 18, 2025 ("Point H Brief") (ECF Doc. # 456); *see also Declaration of Peter Mestousis in Support of the Objection of Point H. Realty Corp. to the Motion of 101 Hudson NY LLC to Enforce Sale Order*, dated Feb. 18, 2025 ("Mestousis Declaration") (ECF Doc. # 457).

the sale transaction approved by the Sale Order and GRANTS the portion of the Motion seeking enforcement of the Sale Order.  The Court will schedule a further hearing on the imposition of civil contempt sanctions against Point H.

## JURISDICTION

The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* (M-431), dated January 31, 2012 (Preska, C.J.), referring to the Bankruptcy Judges of the Southern District of New York bankruptcy cases filed in this District as well as proceedings arising under title 11 or arising in or related to a bankruptcy case.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N).  This Court has jurisdiction to interpret and enforce the Sale Order.  *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) ("[T]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders.").

This Court broadly retained jurisdiction in the Sale Order to, among other things, (i) interpret, implement, and enforce the Sale Order and the terms of the Asset Purchase Agreement, dated October 21, 2024, between the Debtor and the Purchaser ("Purchase Agreement"),[4] (ii) protect the Purchaser from Claims,[5] (iii) resolve any dispute arising under or related to the Purchase Agreement or the sale, and (iv) adjudicate disputes relating to the Debtor's rights, title, or interest in the Debtor's assets.  (Sale Order § 18.)[6]

---

[4]    A copy of the Purchase Agreement is attached as Exhibit B to the Sale Order.

[5]    The term "Claims" is broadly defined in the Sale Order and includes, *inter alia*, "claims" as defined in 11 U.S.C. § 101(5), security interests, encumbrances, obligations, claims of possession, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, limitations, contractual commitments, and rights of setoff or recoupment, whether arising pre-petition or post-petition, whether imposed by agreement, understanding, law, equity or otherwise.  (Sale Order § R.)

[6]    *See also* Purchase Agreement § 11.10 ("Retention of Jurisdiction.  Any and all disputes, disagreements, interpretations, or other matters concerning the final consummation and enforcement of this agreement shall be and remain in the exclusive jurisdiction of the bankruptcy court and, as a result

The Motion plainly fits within this Court's jurisdiction because it presents a dispute that requires the Court to interpret, implement, and enforce the Sale Order and the Purchase Agreement, resolve a claim asserted against the Purchaser by Point H, adjudicate a dispute related to the rights, title, or interest in the Debtor's assets, and is, at bottom, a dispute arising under the sale transaction.[7]

## RELEVANT BACKGROUND

### A.    The Sale to the Purchaser

On October 4, 2023, the Debtor filed a voluntary petition for relief under chapter 11, subchapter V, of the Bankruptcy Code.  (ECF Doc. # 1.)  On December 5, 2023, the Debtor filed an amended petition to remove the subchapter V designation.  (ECF Doc. # 106.)  The Debtor operated the business as a debtor-in-possession under 11 U.S.C. §§ 1107 and 1108 until January 15, 2025, when the Court granted the United States Trustee's motion to convert this case to a case under chapter 7 of the Bankruptcy Code. (ECF Doc. # 437.)

Prior to conversion, the Debtor filed a motion on October 7, 2024 to sell its Business assets ("Sale Motion").[8]  On October 10, 2024, the Court approved the bidding

---

thereof, any pleadings, causes of action or other requests for relief must be brought before said court by the party seeking such relief.") (emphasis omitted).

[7]     Indeed, the possibility of this Court adjudicating the matters raised in the Motion was expressly contemplated in the Purchase Agreement.  (*See* Purchase Agreement § 2.2(a) (providing that the Debtor shall instruct Point H to give the Purchaser access to the Bronx Plant to retrieve the Bronx Purchased Assets "and assist [the Purchaser] in obtaining a Bankruptcy Court order compelling cooperation if [Point H] does not comply").)  That the instant dispute involves two non-debtors does not alter the jurisdictional analysis. *See Luan Inv. S.E. v. Franklin 145 Corp.* (*In re Petrie Retail, Inc.*), 304 F.3d 223, 230 (2d Cir. 2002) (finding that the bankruptcy court had jurisdiction over a dispute between two non-debtors involving the interpretation of the court's orders).

[8]     *See Debtor's Motion for Entry of Orders, Pursuant to 11 U.S.C. §§ 105(a), 363, 503 and 507 and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure: (I) (A) Approving Bidding Procedures and Bidding Protections for the Sale of Certain of the Debtor's Personal Property Wherever Located; (B) Approving the Form and Manner of Notices; (C) Approving the Agreement of Purchase*

procedures for the sale (ECF Doc. # 371) and signed the Sale Order two weeks later. The Sale Order approved the Purchase Agreement under which the Debtor's Business assets were sold to the Purchaser.[9]

The Purchase Agreement broadly defined the "Purchased Assets" as including all of the Debtor's "right, title, and interest in and to all of its assets, properties, and rights of every kind, nature, and description, whether tangible or intangible, wherever located and by whomever possessed relating to the Business, except for the Excluded Assets." (Purchase Agreement § 1.1(a);[10] *accord id*. § 1.1(a)(xii) (containing a catchall provision providing that the Purchased Assets include "all other assets of any kind and nature used by [the Debtor] in the operation of the Business or which relate to the Purchased Assets, except for the Excluded Assets").) Whereas the Purchased Assets were broadly defined, the "Excluded Assets" were narrowly delineated to include assets such as accounts receivable, cash and cash equivalents, rights under certain contracts and leases, tax refunds, and the Debtor's books and records. (*Id*. § 1.3(a).)

The Purchase Agreement required the Debtor to deliver all Purchased Assets at closing to the Purchaser, except for the Bronx Purchased Assets. (*Id*. § 2.2(a).) For the Bronx Purchased Assets, the Debtor was to instruct Point H to "provide Purchaser with

---

*and Sale Subject to Higher and Better Offers; (D) Scheduling a Sale Hearing Date; and (E) Granting Related Relief, and (II) (A) Approving the Sale of the Debtor's Personal Property Wherever Located Free and Clear of Liens, Claims and Encumbrances; and (B) Granting Related Relief*, dated Oct. 7, 2024 (ECF Doc. # 351).

[9]    The Sale Order identified TomJack Properties, Inc. as the successful bidder and the Purchaser as the backup bidder and approved asset purchase agreements with both entities. Subsequently, the Debtor and TomJack Properties stipulated to terminate their asset purchase agreement, and the termination was approved by the Court. (ECF Doc. # 398.)

[10]    *See also* Purchase Agreement § 1.1(a)(i) - (xii) (providing an extensive list of all assets comprising the Purchased Assets).

access to the Bronx Purchased Assets located at the Bronx Plant[.]"  (*Id.*; *see also id.* §
1.2(a)(i).)  Further, the Debtor was to assist the Purchaser "in obtaining a Bankruptcy
Court order compelling cooperation if [Point H] does not comply . . . ."  (*Id.* § 2.2(a).)

The sale closed on November 20, 2024,[11] and the Purchaser paid the Debtor
$1,360,000 for the Purchased Assets.[12]  Nonetheless, the task of retrieving the Bronx
Purchased Assets remained.

## B.    Events Leading to the Motion

Point H has been an active participant in this bankruptcy case (*e.g.*, ECF Doc.
# 50 (Point H's motion for relief from the automatic stay); ECF Doc. # 68 (Point H's
opposition to retention of Debtor's counsel and CRO); ECF Doc. # 252 (Point H's
joinder to the creditors' committee's opposition to the extension of Debtor's exclusivity
periods); ECF Doc. ## 300-302 (Point H's opposition to the Debtor's motion for
sanctions for violations of the automatic stay)), its attorneys received notice of the Sale
Motion (ECF Doc. # 354 (certificate of service)), and Point H's attorneys and principals
have routinely attended hearings in this case including in connection with the sale.

Upon closing of the sale, attorneys for Point H and the Purchaser had a call, and
counsel to the Purchaser followed up with an email on November 25, 2024 providing
sale-related documents and advising that Debtor's counsel would be filing a notice of
sale consummation on the docket.[13]

---

[11]    *See Notice of Closing of Sale of Certain of Debtor's Assets*, dated Nov. 25, 2024 (ECF Doc. # 415).

[12]    The purchase price set forth in the Purchase Agreement was $1,500,000.  (Purchase Agreement
§ 1.6.)  However, the parties agreed to reduce the price to $1,360,000 upon the Purchaser's observation
that certain of the Debtor's assets had material damage that was previously undisclosed.  The Court
approved the parties' agreement to reduce the price.  (*See So Ordered Stipulation Amending Backup
Bidder APA*, dated Nov. 19, 2024 ("Stipulation Amending Purchase Agreement") (ECF Doc. # 402).)

[13]    A copy of the November 25 email is attached as Exhibit E to the Motion.

On December 2, 2024, Point H's bankruptcy counsel sent a letter ("December Letter")[14] to Purchaser's counsel stating that, while Point H was committed to acting reasonably to permit retrieval of the Bronx Purchased Assets, removal of certain assets would likely cause damage to the premises.  (December Letter at 1.)  Citing to provisions of its prior commercial lease with the Debtor, counsel to Point H stated that the Purchaser must procure insurance for the removal.  (*Id*.)  Counsel to Point H added that Point H "is entitled to reasonable use and occupancy for storage of the purchased assets pending removal.  This has been calculated to be $3,000.00 per diem based upon the fair market value" of the Bronx Plant.  (*Id*. at 2.)

On December 3, 2024, representatives of the Purchaser arrived at the Bronx Plant to assess the scope of work necessary to remove the Bronx Purchased Assets.  At the time, they removed certain smaller plant parts, two payloaders, and concrete block forms.  (*Declaration of Yehuda Rubin in Support of 101 Hudson NY LLC's Motion to Enforce the Sale Order Against Point H. Realty Corp.*, dated Feb. 7, 2025 ("Rubin Declaration") ¶ 6 (ECF Doc. # 448-2).)  The concrete plant at the Bronx Plant was full of concrete requiring approximately two days of draining before it could be removed.  Thus, the Purchaser rented a generator to facilitate the concrete removal process and had it delivered to the Bronx Plant.  The generator, which costs $5,175 per month in rental fees, remains in the Bronx Plant.  (*Id*. ¶¶ 6-7.)

When representatives of the Purchaser returned to the Bronx Plant on December 4, a Point H representative told them to cease work and leave.  (*Id*. ¶ 8.)  On December

---

[14]    A copy of the December Letter is attached as Exhibit F to the Motion.

5, Point H's owner told a representative of the Purchaser that the Purchaser would not be permitted to continue removal at that time. (*Id.* ¶ 9.)

On December 12, Point H's bankruptcy counsel sent an email to Purchaser's counsel stating that it was "unacceptable and not efficient" for the Purchaser's business representatives to contact Point H business representatives; rather, according to Point H's counsel, it was "imperative that any and all matters be addressed through the attorneys preferably in writing." Point H's bankruptcy counsel instructed Purchaser's counsel to formally respond to the December Letter.[15]

Counsel to the Purchaser responded to the December Letter by email on December 13 stating that (i) the Purchaser did not assume the commercial lease between Point H and the Debtor, and therefore, the lease's obligation for maintaining insurance did not apply to the Purchaser, (ii) the Purchase Agreement's definition of Purchased Assets broadly included all assets used in the Business, except the Excluded Assets, and was not limited to the schedule annexed to the Sale Order[16] – a viewpoint also endorsed by Debtor's counsel, and (iii) a $3,000-per-day storage fee was not included in the Purchase Agreement or any other Court order.[17]

Point H's bankruptcy counsel responded by email on December 16 requesting that the Purchaser and the Debtor specify the assets comprising the Bronx Purchased Assets. She added that the Purchaser may otherwise schedule a time to remove the

---

[15]    A copy of the December 12 email is attached as Exhibit H to the Motion.

[16]    Included in the scope of the Purchased Assets were "all furnishings, fixtures, and equipment, and other tangible personal property, listed on the finalized schedule of assets provided by [the Debtor] and attached [to the Purchase Agreement] as Schedule 1.1(a)(ii)." (Purchase Agreement § 1.1(a)(ii).) An updated version of Schedule 1.1(a)(ii) ("Updated Equipment Schedule") was annexed to the Stipulation Amending Purchase Agreement and approved by the Court.

[17]    A copy of the December 13 email is attached as Exhibit I to the Motion.

8

Bronx Purchased Assets subject to implementation of appropriate safety measures.  She reiterated that the Purchaser must pay the $3,000 daily use and occupancy amount.[18]

In response, Debtor's counsel sent an email to Point H's bankruptcy counsel (copying, among others, counsel to the Purchaser) quoting section 1.1(a) of the Purchase Agreement stating that the Purchased Assets include all assets "wherever located and by whomever possessed relating to the Business, except for the Excluded Assets."[19]  In a separate email, Debtor's counsel reiterated to Point H's bankruptcy counsel that, "[a]s set forth in the [Purchase Agreement], the Debtor sold all of its assets that are not specifically excluded or that were not redlined on the [Updated Equipment Schedule]."[20]

Purchaser's counsel followed up with an email to Point H's bankruptcy counsel on December 18 asking whether the parties could discuss scheduling a time for removal of the Bronx Purchased Assets since the Debtor and the Purchaser were in agreement about the scope of the assets that were purchased.  Between December 18, 2024 and January 6, 2025, counsels for Point H and the Purchaser exchanged multiple emails on the following matters:

- The Purchaser had procured liability insurance to cover potential damages caused by the removal;[21]

- The Purchaser estimated that removal of all the Bronx Purchased Assets would take approximately four weeks after the concrete plant was drained;

---

[18]    A copy of the December 16 email from Point H's bankruptcy counsel is attached as Exhibit J to the Motion.

[19]    A copy of the December 16 email from Debtor's counsel is attached as Exhibit K to the Motion.

[20]    A copy of this second December 16 email from Debtor's counsel is attached as Exhibit L to the Motion at ECF p. 3.

[21]    A copy of the Purchaser's certificate of liability insurance is available at ECF Doc. # 448-16 at ECF p. 9.

- Point H reiterated that it was entitled to charge the Purchaser a daily $3,000 use and occupancy fee; and

- Point H would permit the Purchaser to resume removal of the purchased assets on January 6, 2025.[22]

Point H also raised a new issue in this chain of emails.  Specifically, Point H's bankruptcy counsel asserted in a December 26 email that the Purchaser may not remove "certain heating equipment" which belongs to Point H under the terms of its commercial lease with the Debtor.[23]

On January 6, representatives of the Purchaser returned to the Bronx Plant to resume removal efforts including chipping areas of concrete that had been cemented around certain of the Bronx Purchased Assets or were otherwise impeding the removal process.  (Rubin Declaration ¶ 10.)  On January 8, a Point H representative told the Purchaser to cease its removal work (*id*. ¶ 11), and Purchaser's counsel emailed Point H's bankruptcy counsel to ask why the Purchaser was given this instruction.[24]

Between January 8 and January 22, Point H's bankruptcy counsel and Purchaser's counsel exchanged emails on several matters.[25]  First, Point H's bankruptcy counsel stated that the Purchaser should not chip concrete as part of the removal process.  Purchaser's counsel responded as follows:

> [M]y understanding from my client is that there are certain pieces of equipment, included in the sale, that have been secured to the ground with concrete in the past.  In order to be able to allow access for the crane and

---

[22]    A copy of the email chain containing the emails between December 18, 2024 and January 6, 2025 is attached as Exhibit S to the Motion.

[23]    A copy of the December 26 email from Point H's counsel is attached as Exhibit Q to the Motion.

[24]    A copy of the January 8 email from Purchaser's counsel is attached as Exhibit T to the Motion.

[25]    A copy of the email chain containing the emails between January 8 and January 22, 2025 is attached as Exhibit AA to the Motion.

> flatbed truck and to remove the equipment, [Purchaser] is required to
> perform targeted chipping at the concrete in order to free the equipment.
> This is being done as efficiently and safely as possible and my client has
> informed me that there is no foundation to be compromised through this
> work as the equipment was concreted into the I-beams (not any
> foundation). I am able to confirm that [Purchaser] will remove any
> concrete that they need to remove during this process in order to avoid any
> safety hazards or remaining debris.

Despite this explanation and the Purchaser's procurement of liability insurance, Point

H's bankruptcy counsel insisted that the Purchaser "post a bond for at least

$2,000,000.00 . . . in the event [the Purchaser does] not clean all the debris and

continue to cause damage to person and property and the existing structures." Second,

Point H's counsel reiterated that the water heater "is not part of the sale and was

specifically designated as [Point H's] property under the lease." Third, Point H's

counsel stated that Point H would not permit the Purchaser to utilize a crane within the

Bronx Plant to remove the Bronx Purchased Assets. Last, Point H's counsel asked

Purchaser's counsel for a "detailed plan of removal."

These discussions ultimately led to a January 28, 2025 meeting among business

representatives and counsel for the Purchaser and Point H as well as a representative

from Concrete Plants, Inc. – an entity that had been assisting with the removal process.

(Rubin Declaration ¶ 12; *Declaration of Sophia Herbst in Support of the Motion of 101

Hudson NY LLC to Enforce the Sale Order Against Point H Realty Corp.*, dated

February 7, 2025 ("Herbst Declaration") ¶ 9 (ECF Doc. # 448-3).) At the meeting, a

representative of the Purchaser confirmed that the Purchaser "would remove any debris

generated by, and backfill areas impacted by, the removal process." (Rubin Declaration

¶ 13.) Further, "the heaviest piece of the concrete plant, weighing 65,000 pounds, could

not be safely removed using a crane positioned outside of the [Bronx Plant]. Instead,

the crane would need to be on the Premises." (*Id.*)  Business representatives of Point H and the Purchaser agreed to meet again on January 30, 2025 for a walk-through in the Bronx Plant to identify the items the Purchaser intended to remove.  (*Id.*)

The representative of the Purchaser and the owner of Point H met on January 30. At the meeting, Point H's owner showed the Purchaser representative areas where he alleged removal efforts had caused damage.  (*Id.* at 14.)  Point H's owner then offered to permit continuation of the removal process if the Purchaser paid Point H $250,000. (*Id.*)[26]  When the Purchaser representative refused to pay the requested amount, a Point H representative gave the Purchaser representative a document titled Notice of Termination of License and/or Notice to Quit ("Termination Notice").[27]  (*Id.*)  The Termination Notice purported to do the following:

- Revoke "any license [the Purchaser] may have had" to access the Bronx Plant;
- Require the Purchaser to "quit, vacate, and surrender possession" of the Bronx Plant to Point H on or before February 12, 2025;
- Provide that the Purchaser is "indebted to [Point H] for the fair value of your use and occupation of the [Bronx Plant] at the monthly rate of $90,000 for the period from November 1, 2024, through and including the date until [Point H] obtains legal possession of the [Bronx Plant], plus interest"; and
- Provide that Point H may "commence a summary proceeding or an action at law to recover possession as well as entry of a money judgment for any and all sums due and owing" if the Purchaser failed to vacate.

In a February 7 email, Point H's bankruptcy counsel confirmed to Purchaser's counsel that Point H would not be rescinding the Termination Notice.[28]

---

[26]    Point H's owner characterizes this demand as a counteroffer.  (Mestousis Declaration ¶ 7 ("I did not believe that the figure that he offered was fair and I suggested a higher number based upon the daily rate that he used.").)

[27]    A copy of the Termination Notice is attached as Exhibit BB to the Motion.

[28]    A copy of the February 7 email from Point H's counsel is attached as Exhibit FF to the Motion.

According to the Purchaser, removal of the Bronx Purchased Assets would have been completed by January 1, 2025 had it been permitted to proceed without interruption.  (Rubin Declaration ¶ 16.)

## C.    The Instant Motion

On February 7, 2025, the Purchaser filed the instant Motion to enforce the Sale Order against Point H.  The Purchaser stated that, despite its efforts to accommodate and address Point H's concerns, Point H has continued to obstruct its efforts to remove the Bronx Purchased Assets which remain at the Bronx Plant.  (Purchaser Brief at 18-21.)  The Purchaser requested that Point H be ordered to pay the Purchaser's reasonable expenses, including attorneys' fees and costs, incurred in enforcing the Sale Order.  (*Id.* at 21.)  Point H responded on February 18 stating that the Motion presented a skewed version of the facts, and asserting that the Purchaser filed the Motion to obtain negotiation leverage over Point H.  (*See generally* Point H Brief.)[29]

## DISCUSSION

## A.    This Court's Sanctioning Authority

The Second Circuit recently reaffirmed the Bankruptcy Court's authority to issue sanctions to ensure compliance with its orders:

> There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt.  Indeed, it is firmly established that the power to punish for contempts is inherent in all courts and this power is governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.

---

[29]    The Court's scheduling order required Point H to file its objection to the Motion by February 15, 2025 at 5:00 p.m.  (ECF Doc. # 452.)  Point H did not request an extension of this deadline and belatedly filed the Point H Brief on February 18, 2025 – the eve of the hearing on the Motion.  The Mestousis Declaration was also filed on the eve of the hearing at 11:28 p.m.

. . .

> [I]n *Sanchez*, we followed our sister circuits and interpreted *Chambers* to
> stand for the proposition that inherent sanctioning powers are not
> contingent on Article III, but rather are, as their name suggests, inherent
> in the nature of federal courts as institutions charged with judicial
> functions.  We held in *Sanchez*, therefore, that bankruptcy courts, like
> Article III courts, possess inherent sanctioning powers.

*Worms v. Rozhkov* (*In re Markus*), 78 F.4th 554, 564 (2d Cir. 2023) (quoting *Shilltani*

*v. United States*, 384 U.S. 364, 370 (1966); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-

44 (1991); *Rosellini v. U.S. Bankr. Ct.* (*In re Sanchez*), 941 F.3d 625, 627-28 (2d Cir.

2019) (per curiam)) (alterations and internal quotation marks omitted).  Section 105(a)

of the Bankruptcy Code empowers the Court to issue "any order, process, or judgment

that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.

Section 105(a) complements this Court's inherent sanctioning authority:

> The statutory contempt powers given to a bankruptcy court under § 105(a)
> complement the inherent powers of a federal court to enforce its own
> orders.  . . .  [Section] 105(a) does not itself create a private right of action,
> but a court may invoke § 105(a) if the equitable remedy *utilized* is
> demonstrably necessary to preserve a right elsewhere provided in the
> Bankruptcy Code.  . . .  These powers are in addition to whatever inherent
> contempt powers the court may have and must include the award of
> monetary and other forms of relief to the extent such awards are necessary
> and appropriate to carry out the provisions of the Bankruptcy Code and
> provide full remedial relief.

*Solow v. Kalikow* (*In re Kalikow*), 602 F.3d 82, 96-97 (2d Cir. 2010) (citing *Bessette v.*

*Avco Fin. Servs., Inc.*, 230 F.3d 439, 444-45 (1st Cir. 2000)) (internal quotation marks

omitted; emphasis in original).

A civil contempt sanction may be compensatory or coercive in nature.  *Markus*,

78 F.4th at 566 (citing *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 144 (2d Cir. 2014)).

The Court may hold a party in civil contempt if "there is no fair ground of doubt as to

whether the order barred" the party's conduct.  *Taggart v. Lorenzen*, 587 U.S. 554, 557

(2019) (emphasis omitted); *see also id.* ("In other words, civil contempt may be

appropriate if there is no objectively reasonable basis for concluding that the creditor's

conduct might be lawful."); *accord Off. Comm. of Unsecured Creditors of Windstream*

*Holdings, Inc. v. Charter Commc'ns Operating, LLC* (*In re Windstream Holdings,*

*Inc.*), 105 F.4th 488, 495 (2d Cir. 2024) (finding that *Taggart*'s objective standard

applies "to § 105 contempt actions that are not covered by § 362(k)").

Last, due process requires that the subject of the proposed sanctions be notified

of "(1) the source of authority for the sanctions being considered; and (2) the specific

conduct or omission for which the sanctions are being considered so that the subject of

the sanctions motion can prepare a defense."  *Markus*, 78 F.4th at 568 (quoting *Sapir v.*

*60 E. 80th St. Equities, Inc.* (*In re 60 E. 80th St. Equities, Inc.*), 218 F.3d 109, 117 (2d

Cir. 2000)).

## B.    Point H has Obstructed the Implementation of the Sale Order

Pursuant to the Sale Order and the Purchase Agreement, the Purchaser

purchased the Purchased Assets, including the Bronx Purchased Assets, and the sale

closed on November 20, 2024.  As set forth *supra*, "Purchased Assets" is broadly

defined as all assets "wherever located and by whomever possessed relating to the

Business, except for the Excluded Assets."  (Purchase Agreement § 1.1(a); *accord id.* §

1.1(a)(xii).)  As contemplated in the Purchase Agreement (*id.* §§ 2.2(a); 1.2(a)(i)), the

Debtor and the Purchaser have communicated the broad scope of the Purchased Assets

to Point H in order to facilitate removal.

Point H has taken several actions to obstruct and impede the retrieval of the

Bronx Purchased Assets, and thus, the completion of the sale under the Sale Order.

First, Point H's persistent insistence on being paid a $3,000-per-day use-and-occupancy fee is frivolous.[30]  "A landlord-tenant relationship is the *sine qua non* for this remedy."  *El Gallo Meat Mkt., Inc. v. Gallo Mkt., Inc.*, 286 A.D.2d 255, 256 (N.Y. App. Div. 2001); *accord 14 Second Ave. Realty Corp. v. Anne Steven Corp.*, 16 A.D.2d 751, 751 (N.Y. App. Div. 1962) ("There was never a landlord and tenant relation between the parties; therefore, no basis for a recovery predicated on use and occupation is present."), *aff'd*, 188 N.E.2d 404 (N.Y. 1963); *cf. Hudson-Spring P'ship, L.P. v. P+M Design Consultants, Inc.*, 112 A.D.3d 419, 419-20 (N.Y. App. Div. 2013) (stating that subtenants could be liable for a use and occupancy claim).[31]  Here, there is no landlord-tenant relationship of any kind between Point H and the Purchaser.  More fundamentally, the Purchaser is neither "using" nor "occupying" the Bronx Plant simply because a portion of the Purchased Assets sits in the Bronx Plant.  The Court has entered no order suggesting that Point H could charge a use and occupancy fee to the Purchaser.  Instead, the Purchase Agreement contemplated a process by which the Purchaser, with assistance from the Debtor, would retrieve the Bronx Purchased Assets.  As set forth herein, Point H's own actions have delayed the removal process.[32]

---

[30]    Point H is represented by real estate counsel in addition to its bankruptcy counsel.

[31]    Further, a use and occupancy claim under New York law requires "that the landlord's claim to reasonable compensation for use and occupation be rooted in an agreement, written or oral." *Schenectady Indus. Corp. v. Upstate Textiles, Inc.*, No. 06-CV-1493 (GLS), 2008 WL 5056909, at *3 (N.D.N.Y. Nov. 24, 2008) (quoting *Turner & Blanchard, Inc. v. Kheel* (*In re Seatrade Corp.*), 345 F.2d 785, 787 (2d Cir. 1965)).  Point H's assertion of a $3,000-per-day use-and-occupancy claim is not rooted in any agreement with the Purchaser.

[32]    Although there is no use and occupancy claim under the circumstances, Point H's continuing obstruction of the Purchaser's efforts to retrieve the Bronx Purchased Assets and complete the sale under the Sale Order may give rise to a conversion claim.  *Colavito v. New York Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006) ("Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights.") (citations omitted).

Second, Point H unreasonably refused to allow the Purchaser to chip concrete (*see* January 8 email from Point H bankruptcy counsel (Chipping concrete "is simply not authorized or appropriate."))[33] or use a crane (*see* January 22 email from Point H bankruptcy counsel ("[A]s we have previously advised, our client does not want a crane on the property."))[34] to retrieve certain of the Bronx Purchased Assets. Some targeted chipping of concrete was necessary because certain of the Bronx Purchased Assets had been cemented in place or were otherwise impeded from removal by cemented items. (Rubin Declaration ¶ 10.) The Purchaser sought to accommodate Point H's concerns by confirming that it would remove debris generated by, and backfill areas impacted by, the chipping. (*Id.* ¶ 13.) The Purchaser also procured liability insurance to cover potential damage claims. (*See* Motion, Ex. P. at ECF p. 9-10.) Further, the use of a crane from within the premises was needed to safely remove the heaviest piece of equipment – a concrete plant weighing 65,000 pounds. (Rubin Declaration ¶ 13.) Point H's continued resistance to concrete chipping and the use of a crane is tantamount to an outright prohibition against removal of the Bronx Purchased Assets and completion of the sale transaction.

Indeed, Point H previously acknowledged that concrete chipping and the use of a crane would be necessary to remove the Bronx Purchased Assets. Some context is helpful here to describe Point H's position. On August 13, 2024, Point H evicted the Debtor from the Bronx Plant.[35] The following day, Debtor's counsel wrote a letter to

---

[33]    *See* Exhibit AA to the Motion at ECF p. 6.

[34]    *See* Exhibit AA to the Motion at ECF p. 2.

[35]    The commercial lease between Point H and the Debtor had lapsed, and the Court entered an order on November 22, 2023 confirming that the automatic stay was no longer applicable pursuant to 11

Point H's real estate counsel seeking return of property of the Debtor's bankruptcy estate, including assets related to the concrete production facility, and argued that Point H's retention of such property was a violation of the automatic stay under 11 U.S.C. § 362(a). (*See Letter of Brendan Scott*, dated Aug. 14, 2024 ("Debtor's Counsel Letter") at 1-2 (ECF Doc. # 294-3).) In his response letter, Point H's real estate counsel stated as follows: "It is my understanding that removing the Plant Assets will require, *inter alia*, heavy equipment, cranes, excavation, etc." (*Letter of Anthony G. Piscionere*, dated Aug. 15, 2024 at 2 (ECF Doc. # 294-4).)[36] The "Plant Assets" referenced in the August 15 letter of Point H's real estate counsel represent a portion of the Bronx Purchased Assets subject to this Motion. Having previously acknowledged that excavation and cranes were necessary to remove the Bronx Purchased Assets, Point H's refusal to permit the Purchaser to utilize the same removal procedures is plainly unreasonable.

Third, Point H's position that it is entitled to retain the water heater (*see* January 22 email from Point H's bankruptcy counsel ("[T]he lease specifically excluded the

---

U.S.C. § 362(b)(10). (ECF Doc. # 89.) Until the eviction, the Debtor continued to operate the Business in the Bronx Plant by stipulating to pay Point H a monthly use and occupancy fee.

[36]     This dispute between the Debtor and Point H led to a motion by the Debtor to enforce the automatic stay and to impose sanctions against Point H for willful violations of the automatic stay ("Debtor's Sanctions Motion"). (ECF Doc. # 292.) The Court was troubled by what appeared to indisputably be willful violations of the automatic stay by Point H. After adjourning the motion on the record at the August 29, 2024 hearing to permit the parties to attempt to come to a consensual resolution, the Court took the matter under advisement at the September 10, 2024 hearing and prepared a bench ruling to read into the record at the September 24, 2024 hearing. At the beginning of the September 24 hearing, however, Debtor's counsel notified the Court that the parties, including Point H, had agreed to work together toward a sale of the Business assets, and the Court stayed issuance of its bench ruling on that basis. The Debtor's Sanctions Motion was adjourned on several occasions thereafter until, at the January 7, 2025 hearing, Point H's bankruptcy counsel requested that the Debtor's Sanction Motion be denied on the basis that Point H was cooperating with the Purchaser to retrieve the Bronx Purchased Assets. Based on counsel's representation, the Court agreed to deny the Debtor's Sanctions Motion, without prejudice, and entered an order to that effect on January 10, 2025. (ECF Doc. # 436.) Based on the evidence provided by the Purchaser in the instant Motion, the representations of Point H's bankruptcy counsel to the Court at the January 7 hearing were questionable if not misleading.

heater from items that may be removed by the tenant. As a fixture, it is property of

[Point H] under the lease and was not included in the sale.")) is entirely without merit.[37]

As stated, the scope of the Purchased Assets broadly included all of the Debtor's assets

related to the Business. (Purchase Agreement § 1.1(a).) In fact, the water heater was

specifically included in Schedule 1.1(a)(ii) of the Purchase Agreement as being an asset

subject to the sale as well as the updated version of the schedule (*i.e.*, the Updated

Equipment Schedule) filed as an attachment to the Stipulation Amending Purchase

Agreement. (*See* Updated Equipment Schedule at row 6.)

Point H's assertion that it is entitled to keep the water heater under its prior lease

with the Debtor is wholly unsupportable. Initially, the lease has lapsed, and the

Purchaser was never party to the lease. Assuming *arguendo* that the lease governed the

ownership of the water heater, such lease included a rider ("Lease Rider"),[38] which

clearly stated that the tenant's trade fixtures, such as the water heater, remained

property of the tenant:

> [Point H] agrees that all Tenant's trade fixtures, as well as all alterations,
> decorations, installations, additions or improvements which shall be made
> at the expense of Tenant and which shall be removable without causing
> material damage to the premises, *shall at all times be and remain
> property of Tenant and may be removed by Tenant at any time during
> the term of the lease.*

(Lease Rider § 41 (emphasis added).)[39] Point H's bankruptcy counsel took the

unsupportable position that the water heater was Point H's property despite being told

---

[37]    *See* Exhibit AA to the Motion at ECF p. 2.

[38]    A copy of the Lease Rider is available at ECF Doc. # 448-6 at ECF pp. 9-15. The copy of the underlying lease is available at ECF Doc. # 448-6 at ECF pp. 5-8.

[39]    The Lease Rider provided that the terms of the Lease Rider shall govern in the event of a conflict between the terms of the lease and the Lease Rider. (Lease Rider § 36.)

that the water heater was placed in the Bronx Plant by the Debtor and was the Debtor's property under section 41 of the Lease Rider.  (*See* Ex. Z to the Motion (email from Purchaser's counsel) and Ex. AA (response email from Point H's bankruptcy counsel).)

Fourth, Point H's service of the Termination Notice was a willful obstruction of the transaction set forth in the Sale Order.  As stated, the Termination Notice purports to revoke the Purchaser's license to access the Bronx Plant and threatens a summary proceeding to recover possession of the Bronx Plant as well as money damages. (Termination Notice at 1-2.)[40]  A license "connotes use or occupancy of the grantor's premises," *Z. Justin Mgmt. Co., Inc. v. Metro Outdoor, LLC*, 137 A.D.3d 577, 578 (N.Y. App. Div. 2016), and courts must look to the underlying instrument between the parties to discern whether the arrangement created a lease or a license.  *City of New York v. Pennsylvania R.R. Co.*, 333 N.E.2d 361, 362 (N.Y. 1975).  There was no formal or informal arrangement between Point H and the Purchaser for use or occupancy of the Bronx Plant.  Rather, pursuant to the Purchase Agreement, the Purchaser purchased the Purchased Assets wherever located and by whomever held including the Bronx Purchased Assets.  (Purchase Agreement § 1.1(a).)  As stated, the Purchase Agreement contemplated that the Purchaser would have access to the Bronx Plant to retrieve the Bronx Purchased Assets.  Point H was served with the Sale Motion and attended hearings pertaining to the sale but never objected to any term of the Sale Order or

---

[40]    The Termination Notice cites section 713(7) of the New York Real Property Actions & Proceedings Law, which provides that a summary proceeding to recover real property against a licensee may be brought on ten-day notice when "(a) his license has expired, or (b) his license has been revoked by the licensor, or (c) the licensor is no longer entitled to possession of the property . . . ."

Purchase Agreement, including the obvious fact that the Purchaser would have to
retrieve the Bronx Purchased Assets from the premises of the Bronx Plant.[41]

In sum, Point H, and its attorneys, have treated the process of removing the
Bronx Purchased Assets as a means to gain leverage over, and litigate against, the
Purchaser.  Rather than taking reasonable measures to permit retrieval of the Bronx
Purchased Assets, Point H forced the Purchaser to cease removal on several occasions
(including in early December and early January), pressed frivolous legal positions, and
created impossible obstacles to removal.  Point H's service of the Termination Notice
and demand for a $250,000 payment made plain its intent to frustrate the completion
of the sale transaction.  Therefore, the Court finds that Point H has willfully obstructed
the sale transaction approved by the Sale Order, and a separate order enforcing the Sale
Order against Point H is necessary and appropriate.

### C.    Sanctions

As stated, due process requires that the party subject to proposed sanctions be
notified of the source of authority for the sanctions and the conduct for which sanctions
are being considered.  Point H is hereby notified that the Court is considering the
imposition of civil contempt sanctions against Point H for its actions in obstructing the
sale, as outlined in this Memorandum Decision, pursuant to this Court's inherent
sanctioning authority as supplemented by 11 U.S.C. § 105(a).  Sanctions against Point H
may include (i) award of compensatory damages to the Purchaser, including, but not
limited to, attorneys fees and costs, and (ii) coercive sanctions as necessary to address

---

[41]    Attempts to prosecute the Termination Notice will further violate the Sale Order and could lead to
the issuance of sanctions by this Court.

further obstruction of the sale transaction.  The issuance of sanctions will be subject to a further hearing, and Point H will be afforded an opportunity to respond.

## **<u>CONCLUSION</u>**

For the reasons stated, the branch of the Motion seeking enforcement of the Sale Order against Point H is GRANTED.  Counsel to the Purchaser shall settle an order on notice pursuant to Local Bankruptcy Rule 9074-1 consistent with this Memorandum Decision.  In addition to provisions pertaining to the immediate enforcement of the Sale Order and retrieval of the Bronx Purchased Assets, the proposed order shall include the following dates for a further hearing on the imposition of civil contempt sanctions against Point H: (i) the Purchaser shall file a brief, and any supporting documents, supporting the imposition of sanctions by March 5, 2025, (ii) Point H shall file a brief, and any supporting documents, opposing the imposition of sanctions by March 19, 2025, and (iii) the Court will hold a hearing to determine appropriate sanctions against Point H on Tuesday, April 1, 2025 at 10:00 a.m.

/s/ Kyu Y. Paek



**Dated: February 19, 2025**
**Poughkeepsie, New York**

_____
**Hon. Kyu Y. Paek**
**U.S. Bankruptcy Judge**